IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| CRYSTAL C. LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:11cv1093-MHT |
| | ) | (WO) |
| EUFAULA CITY BOARD OF, | ) | |
| EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Plaintiff Crystal C. Lewis, an American of African descent, brings this case charging the defendants with discrimination (based on her race) and retaliation (based on her and her father's protected conduct) with respect to her employment. She names as defendants the Eufaula City Board of Education, its five board members, and its superintendent of education. Lewis charges that the defendants' actions violated Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. §§ 1981a, 2000e to 2000e-17; the Civil Rights Act of 1866, as amended and codified at 42 U.S.C. § 1981; and

the First and Fourteenth Amendments to the Constitution as enforced through 42 U.S.C. § 1983.  Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

This case is currently before the court on the defendants' motion for summary judgment.  For the reasons that follow, the motion will be granted in part and denied in part.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant[s] show[] that there is no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec.</u>

2

<u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Here, the defendants are the movants.


## II. BACKGROUND

### A.

Eufaula is a small city in eastern Alabama with a history of racial unrest relating to its public education system.  For some time, the public schools operated under federal court monitoring due to the city schools' history of racial segregation.  Despite the ending of court monitoring, many Eufaula residents continue to have grievances with the school system's treatment of the black community.  A particular point of contention has been the numbers of black teachers and administrators employed by the board.  While over half of the students in the school system are black, the portion of black teachers is roughly 15 %, which some city residents contend is far too low.  Although members of the city school board profess that they have been making efforts

at increasing the ranks of black teachers and administrators, these residents are skeptical. They point to a neighboring school system, where teachers are almost evenly divided between black and white, and they contend that discriminatory employment practices in the Eufaula City Schools must account for the difference in comparative racial percentages.

### B.

Lewis grew up in Eufaula and worked as a physical-education teacher at Eufaula Primary School for about three years. During her first two years, she served under Principal Jessie Warren, who is black. Lewis received, generally, good performance evaluations. Her career, however, took a turn for the worse in the third year when Suzann Tibbs, who is white, replaced Warren as principal.

Because Lewis could obtain tenure only if she were rehired for a fourth year, the Eufaula City Board of

4

Education had to decide at the end of each of these three academic years whether to renew her contract for the following year.  As a general practice, a school principal would forward an initial renewal recommendation to Eufaula City Superintendent Barry R. Sadler; unless he had particular cause for concern, Sadler would, without making inquiry, forward the recommendation to the full board; likewise, unless the board had cause to do otherwise, it would adopt the principal's recommendation. In effect then, renewal decisions were made by principals.  Once Tibbs became principal of Eufaula Primary School, she recommended that Lewis's contract not be renewed and, thus, in effect, that her employment be terminated.  The recommendation was adopted by the board, and Lewis's employment contract was not renewed.

Lewis immediately suspected that something was afoul. Although Principal Tibbs purported to have recommended non-renewal on the basis of Lewis's poor performance (arguing that Lewis was too passive to be an effective

physical education teacher and too hesitant to engage in
outdoors activities), Lewis believed that Tibbs was not
evaluating her performance in good faith.   Lewis
hypothesized that Tibbs wanted her position to open up so
that a personal friend of Tibbs's, who is white, could be
hired.   Lewis felt that her theory was bolstered because
Tibbs had attempted to act on Lewis's employment at least
once before she became principal; on one occasion, Tibbs
approached then-Principal Warren to discuss the possible
non-renewal of Lewis's contract, but Warren rebuffed her,
stating that, based on his observations of Lewis's
performance, he was "not comfortable" with denying
renewal.   Regardless of Lewis's suspicion of Tibbs's
intent, Tibbs's friend, ultimately, did not receive the
position; instead, Lewis's replacement was, like Lewis,
an African-American.   Lewis filed a charge with the U.S.
Equal Employment Opportunity Commission ("EEOC"), arguing
that the decision to end her employment was
discriminatorily made on account of her race.

Lewis began applying for other positions with the school system, but she had no success.  One such position for which she applied was at her previous school, Eufaula Primary School, but she was not selected.  Instead, Ciara Culverhouse, who is white, was chosen based on Tibbs's recommendation.   Although  Culverhouse  had  not  yet obtained  the  licensing  required  for  the  job,  she  was hired  with  the  understanding  that  it  would  be  obtained sometime soon.  Some members of the black community were outraged that allegedly more qualified black applicants were passed over in favor of a white applicant who was without  the  necessary  licensing.   A  crowd  of approximately 100 people attended a school-board meeting to protest the decision.   Among them was a woman who vigorously protested that her daughter Andrea Guilford, who is black and was purportedly highly qualified, was passed over.  Upon this public outpouring of discontent, the board reversed itself and chose to hire Guilford instead of Culverhouse.

7

Shortly after that public reversal, Lewis's father Ronnie Crews attended public meetings of the school board to express his displeasure with the school system's treatment of the black community in general and his daughter Lewis in particular.  He made such appearances on two separate occasions.  According to one board member, Crews's presentations were of a substantial length; he was "quite aggressive"; and he "was acting like a courtroom lawyer cross-examining a witness." Allen N. White Dep. (Doc. No. 29), Exh. K, 27:11-15.  In the opinion of that board member, the presentations were inappropriate and left a lasting impression with him. Crew's presentations to the board were also in line with those of his wife Earnestine Crews.  The Crewses were well known in the community for their outspoken views and involvement in issues having to do with race relations; they regularly criticized the treatment afforded to African-Americans by the local government.

Although Lewis was having no luck with her applications to Eufaula City Schools, a county school expressed interest in her. But, before it could formally consider her, it needed a form signed by Lewis's prior employer, the Eufaula City Board of Education. Superintendent Sadler assured Lewis that he would expeditiously file the form, but he did not. As he understood the form, he was required to attest that Lewis's work had been performed "satisfactorily." Given that her contract was not renewed, he was unsure whether he could make that attestation. His submission of the form was delayed while he sought permission to state on the form that he confirms her employment but does not confirm that her work was satisfactory. By the time he obtained this permission and submitted the form, the county school had already denied Lewis's application and hired another applicant.

Because Lewis was continuing to have no success with her job applications with Eufaula schools (and she had

applied for over 25 different jobs there) and schools within a reasonable distance, her husband Michael Lewis approached Superintendent Sadler to ask whether anything could be done. Sadler responded that he would "never say never," but, for the time being, "nobody is going to hire [Lewis] in Eufaula." Michael Lewis Aff. (Doc. No. 29), Exh. G, ¶ 7.

## C.

Lewis filed this lawsuit claiming that she was discriminated against because of her race and retaliated against because she had filed an EEOC charge and because of her father's speeches to the board. She names as defendants the Eufaula City Board of Education, its five board members (Allen N. White, Jim S. Calton, Jr., Louise Conner, Otis Hill, and James A. Lockwood), and Board Superintendent Sadler.

10

## III. DISCUSSION

### A.

Lewis's first claim is that the defendants did not renew her physical-education teaching contract at Eufaula Primary School because she is African-American. Lewis's complaint, which is not a model of clarity, does not specify the source of law for this claim--whether Title VII, § 1981, the Equal Protection Clause of the Fourteenth Amendment, or all of these. The defendants assert defenses that apply to some, but not all, of those three legal sources. Nevertheless, it is unnecessary to know which basis Lewis is relying on, for, whatever the basis, her claim will be subject to the same standards of proof and will require the employment of the same analytical framework. Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

Lewis's discrimination-in-employment claim, regardless of legal basis, is analyzed under the burden-shifting analysis set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).   See, e.g., Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 (11th Cir. 2011).   Under McDonnell Douglas, she must first demonstrate a prima-facie case, which consists of "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion."   Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977).   "The methods of presenting a prima facie case are flexible and depend on the particular situation."   Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). Once established, a prima-facie case raises a presumption of illegal discrimination, Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981), and a burden of production is then put on the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for its challenged action.   Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000).

If this burden of production is met, the burden is then on the employee to satisfy her ultimate burden of establishing that the employer's proffered reason for the employment decision was a pretext for racial discrimination, a burden which she may satisfy "either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief." Hall v. Alabama Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003). "By so persuading the court, the employee satisfies [her] ultimate burden of demonstrating by a preponderance of the evidence that [she] has been a victim of unlawful discrimination." Id.

Often, the question whether the plaintiff has made out a prima-facie case is irrelevant when the district court considers an employer's motion for summary judgment. Bailey-Potts v. Ala. Dep't of Pub. Safety, 2012 WL 566820, at *3 (M.D. Ala. Feb. 21, 2012)

13

(Thompson, J.).  That is because, "[u]nder the McDonnell Douglas framework, the burden at the first two steps is light for both the plaintiff and the defendant-employer." Id.  Thus, "the real question [often] lies in whether the employer's legitimate non-discriminatory reason is pretextual," id. at *4, which, as stated, is the final inquiry in the McDonnell Douglas analysis.  See Hall, 326 F.3d at 1166 ("'If ... the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework--with its presumptions and burdens--is no longer relevant. ...  The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture.'") (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).

    In this case, the defendants have come forward with evidence that Lewis's employment was not renewed because of dissatisfaction with her performance.  She was, the defendants state, too passive to be an effective

14

physical-education teacher and too hesitant to bring the students outdoors for activities.  Lewis has not come forward with sufficient evidence for a reasonable fact-finder to conclude that this justification is pretextual for racial discrimination.  Viewed in the light most favorable to Lewis, her evidence shows that the Eufaula School System's governance has a past history of racial discrimination; when Lewis reported to a black principal, he found her work satisfactory; when she later reported to a white principal, that principal unfairly ended her employment as part of a scheme to provide a job to a personal friend; and, after that plan went awry, the white principal hired an African-American to replace Lewis.  Under that scenario, although Lewis's employer may have acted unfairly in making the initial employment decision, that unfairness was based on nepotism and not race. Lewis's claim of racial discrimination cannot stand.  See Alexander v. Fulton Cnty., 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to

second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."), overruled on other grounds, Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003).

If Lewis's claim rests on a theory of mixed motives, that is, that Principal Tibbs's decision to end Lewis's employment was driven both by both nepotistic and racist purposes, Lewis must still show that her race was a "motivating factor for [her non-renewal], even though other factors also motivated the [decision]." 42 U.S.C. § 2000e-2(m); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003). Lewis has not presented sufficient evidence to create a logical inference that her race was even a motivating factor. Her evidence that the Eufaula City Schools have a history of racial segregation (which is undisputed) indicates little about her individual circumstances: the termination of her employment. While historical discrimination is often meaningful, see, e.g., Harris v. Birmingham Bd. of Educ., 712 F.2d 1377, 1383

16

(11th Cir. 1983), that history must be linked to the individual circumstances presented, by showing, for example, that one or more of the decision-makers responsible for the past discriminatory practices were one or more of the decision-makers who engaged in the challenged conduct.  As the defendants point out, the members of the board today are not the same members who enforced segregation in the past.  As for evidence specific to Lewis's individual circumstances, she has put forth nothing that would be sufficient to show that the defendants' proffered explanation (dissatisfaction with her performance) was mere pretext for racial discrimination.  Indeed, after her employment ended, she was in fact replaced with another African-American.  See Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C. Cir. 2004) ("The employer's hiring of a person of the same race ... as the plaintiff might be relevant in assessing the merits of a plaintiff's claim.").

17

To be sure, replacement of an African-American with another African-American will not, conclusively, defeat an African-American's claim of racially discriminatory firing or failure to renew employment contract.  <u>Cf</u>. <u>Howard v. Roadway Exp., Inc.</u>, 726 F.2d 1529, 1534–35 (11th Cir. 1984) (holding that a plaintiff had established a prima-facie failure-to-hire case notwithstanding evidence that the position sought by the plaintiff was ultimately filled with a person of the same race as the plaintiff).  But, as stated, such evidence is relevant, and here, in the absence of other evidence to support a discrimination claim, the evidence is particularly condemning of the asserted discrimination claim.

To the extent that the defendants' motion for summary judgment goes to Lewis's claim of racially discriminatory non-renewal of her employment contract, the motion will be granted.

18

B.

Lewis's second claim is that the defendants refused to rehire her for a new position because of her race. This claim is also governed by the McDonnell Douglas burden-shifting framework.   See, e.g., Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1274 (11th Cir. 2002).   The defendants have asserted that Lewis's work was unsatisfactory, and Lewis has not come forward with sufficient evidence to show that that explanation is a pretext for race discrimination. Indeed, as for the opening that Lewis applied for and that was initially given to Culverhouse (thus causing outrage in the community), it ultimately went to a black applicant.   While there are certainly circumstances in which a failure-to-hire claim may be supported despite the position going to a person of the same race as the plaintiff, see, e.g., Howard, 726 F.2d at 1534-35 (holding that a plaintiff had established a prima-facie failure-to-hire case notwithstanding evidence that the

position sought by the plaintiff was ultimately filled with a person of the same race as the plaintiff), Lewis has not provided any evidence indicating that this is such a case. As for the numerous other positions that Lewis applied for, she offers no evidence that would support an inference of race discrimination; for example, there is no indication as to who ultimately filled the openings for which Lewis was turned down. For those positions, Lewis has not met her burden of establishing a prima-facie case, let alone presenting sufficient evidence to rebut the defendants' legitimate explanation.

To the extent that the defendants' motion for summary judgment goes to Lewis's claim of racially discriminatory refusal to rehire her, the motion will be granted.

## C.

Lewis's final claims are for retaliation. She first claims that, in violation of Title VII, the defendants refused to rehire her for a new position because she had

20

filed an EEOC charge.   Second, she claims that the
defendants' conduct was also motivated by her father's
speech and, as such, violated the First Amendment.   The
court addresses both retaliation claims in turn.


i.

Under Title VII, employers are prohibited from
"discriminat[ing] against ... [an] applicant[] for
employment ... because [she] has ... made a charge" with
the EEOC.   42 U.S.C. § 2000e-3(a).   A claim asserting
retaliation in violation of that provision is also
governed by the McDonnell Douglas burden-shifting
framework.   See, e.g., Lipphardt v. Durango Steakhouse
of Brandon, Inc., 267 F.3d 1183, 1186-87 (11th Cir.
2001).   For Lewis to establish a prima-facie case of
retaliation, she must show "(1) statutorily protected
expression" (here, that would include that she filed a
charge with the EEOC), "(2) adverse employment action"
(here, that would include the refusal to consider her for

21

rehiring), "and (3) a causal link between the protected expression and the adverse action" (that is, any evidence suggesting that, in refusing to rehire her, the defendants were actually motivated by the EEOC charge). Id. at 1186 (quotation marks and citation omitted).  Once Lewis establishes a prima-facie case, the defendants must articulate a legitimate, non-discriminatory reason for not rehiring her, which, if articulated, would put the burden on Lewis to prove by a preponderance of the evidence that the reason offered by the defendants is a pretext for retaliation.  Id.

Here, Lewis has established not only a prima-facie case of retaliation in violation of Title VII, she has also presented sufficient evidence to raise a factual question of whether the defendants refused to rehire her because she had filed an EEOC charge.  First, there is the obvious: At the time the defendants refused to rehire her, she had filed an EEOC charge.  Second, the defendants' actions must be placed against a backdrop in which Lewis's

father had complained to board members about the board's treatment of Lewis, charging them with racial discrimination, and at least one board member had found his remarks inappropriate and offensive.[1]  Finally, in responding to an inquiry into whether anything could be done for Lewis to be rehired, Superintendent Sadler stated to Lewis's husband that "nobody is going to hire [Lewis] in Eufaula."  Michael Lewis Aff. (Doc. No. 29), Exh. G, ¶ 7.[2]  Depending on the superintendent's tone and expression

---

1.    Lewis does not claim that the defendants' alleged retaliation against her for her father's speech violated Title VII.  Rather she claims that, to the extent that the defendants' retaliation was motivated by such speech, the defendants violated the First Amendment, not Title VII.   The Title VII claim addresses only the filing of the EEOC charge.  However, given the intertwined nature of the EEOC charge and Lewis's father's speech (both of which accused the defendants of racially discriminating against Lewis), the evidence that, at least, one board member professed displeasure with her father's speech is background supporting an inference that the board had a retaliatory motive with respect to Lewis's charge of discrimination.

2.    The defendants argue that the statement is inadmissible hearsay and cannot be considered. Superintendent Sadler, however, is one of the defendants

(continued...)

and the surrounding circumstances when made, this statement could be viewed as a cryptic comment about Lewis's perceived persona non grata status in the school community due to complaints, including her own, about the school board's treatment of black employees. Put together, and drawing all reasonable inferences in favor of Lewis, these allegations are enough to raise a question of fact as to whether the defendants, in retaliation for being charged with discrimination, refused to consider Lewis for possible rehiring.[3]

_____

(...continued)
in this lawsuit and his prior statement was offered into evidence by Lewis, his opponent in this litigation. A statement is "not hearsay" if it is "offered against an opposing party and ... was made by the party." Fed. R. Evid. 801(d)(2)(A). Therefore, the statement is not hearsay.

3. Causation may also be established by temporal proximity between the protected conduct and the adverse-employment action, though, "without more, [the period between the charge and the adverse action] must be 'very close.'" Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (citation omitted). "Three to four month[s]" is too much time to suffice. Id. A one-month period is sufficient to show causation. Donnellon v.

(continued...)

Although the court has held that the evidence is
insufficient to find that Lewis's race was a factor in the
board's refusal to rehire her, the court cannot say the
same about her EEOC charge.  In other words, the evidence
is sufficient to create a "genuine dispute [of] material
fact," Fed. R. Civ. P. 56(a), as to whether Lewis's EEOC
charge was a substantial factor in the board's refusal to
rehire her.  For that reason, to the extent that the
defendants' motion for summary judgment goes to Lewis's
Title VII claim of retaliation, the motion will be denied.


ii.

Lewis claims that defendants' retaliation was
motivated not only by her EEOC charge, but also, violation

_____

(...continued)
Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986).  Here,
the times between Lewis's EEOC charge and the refusals to
rehire her are too unclear and confusing from the record,
developed so far by the parties, to draw any inferences
one way or the other.

of the First Amendment, by her father's speech.[4] Under the First Amendment, governmental actors are prohibited from "abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.  Under 42 U.S.C. § 1983, Lewis is afforded a statutory right of action to recover monetary damages for the deprivation of her First Amendment rights.  See, e.g., Akins v. Fulton Cnty., 420 F.3d 1293, 1299 (11th Cir. 2005).

The First Amendment prohibits the government from retaliating against persons for their protected speech. See, e.g., Bryson v. City of Waycross, 888 F.2d 1562, 1565

---

4. Lewis does not argue that the defendants violated the First Amendment (rather than Title VII) by retaliating against her for her filing of the EEOC charge.  As such, the court does not address whether she would have such a claim under the First Amendment.  See Merriweather v. Alabama Dept. of Pub. Safety, 17 F. Supp. 2d 1260, 1278 (M.D. Ala. 1998) (Albritton, J.) (discussing whether First Amendment claims may be made out for retaliation for filing of an EEOC charge), aff'd, 199 F.3d 443 (11th Cir. 1999); see also Badia v. City of Miami, 133 F.3d 1443, 1446 (11th Cir. 1998) (same).

(11th Cir. 1989).   The same general principle applies where the protected speech was made by an employee of the government, and the government's retaliation for that speech took the form of an adverse-employment action, such as termination of employment, decreased compensation, or refusal to consider for hiring or re-hiring.  Id.

Often in First Amendment retaliation cases, the government is claimed to have retaliated against the plaintiff for her own speech; but the First Amendment may also be violated where the speech that invoked the government's retaliatory response was not made by the plaintiff herself, but rather by a person in a close relationship with the plaintiff, and the government retaliated against the plaintiff for her perceived association with the other person and that person's speech.  See, e.g., Adler v. Pataki, 185 F.3d 35, 45 (2d Cir. 1999) (holding that "retaliatory discharge based solely on [protected speech] by one's spouse is actionable under the First Amendment"); Talley v. Brentwood Union

Free Sch. Dist., 2009 WL 1797627, at *6 (E.D.N.Y. June 24,
2009) (Hurley, J.) (citing Adler to uphold claim of
retaliation against a daughter for her father's speech);
Cain v. Tigard-Tualatin Sch. Dist. 23J, 262 F. Supp. 2d
1120, 1127 (D. Or. 2003) (Haggerty, C.J.) (upholding claim
that defendant's retaliatory "conduct was motivated by
[plaintiff's] association with his parents' speech");
Agostino v. Simpson, 2008 WL 4906140, at *5 (S.D.N.Y. Nov.
17, 2008) (Seibel, J.) (claim "alleging that Defendants
took adverse action against Plaintiff in retaliation for
[his father's] First Amendment activities"); Serena H. v.
Kovarie, 209 F. Supp. 2d 453, 458 (E.D. Pa. 2002) (Brody,
J.) (upholding "First Amendment claim [that] [the
plaintiff] was retaliated against based upon her mother's
exercise of free speech"); cf. Thompson v. N. Am.
Stainless, LP, 131 S. Ct. 863, 867 (2011) ("We have little
difficulty concluding that if [plaintiff's allegations
that the defendant terminated his employment in
retaliation for his fiancée's filing of a charge with the

28

EEOC] are true, then [the defendant's] firing of [plaintiff] violated Title VII.").

That is because, "[t]he First Amendment protects not only a citizen's right to speak freely but also his or her right" of association.  <u>Cain</u>, 262 F. Supp. 2d at 1127. The First Amendment right of association has two distinct components. <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 617-18 (1984).  First, the right of association encompasses the right to "enter into and maintain certain intimate human relationships."  <u>Id</u>. at 617-18.  "[C]ertain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs," and thus, the right of intimate association is fundamental. <u>Id</u>. at 618-19.  Second, there is the "right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion." <u>Id</u>. at 618.  In cases like this one, where the government is

claimed to have retaliated against a daughter for the speech of her father, and the daughter is allegedly perceived to share the sentiments expressed by her father, "freedom of association in both of its forms" are involved. Id. Lewis has raised a viable question of fact as to whether she was not rehired because of her association with her father and his speech.

Lewis has also asserted a viable claim based solely on free speech. "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). That principle would be severely frustrated if the First Amendment did not include within its protective ambit an employee who bears such a close relationship with a person who engages in protected speech that there is a legally recognizable identity between the employee and the speaker, such as that of immediate family members. Id.

If the government could freely retaliate against such employees, there would be an "obvious chilling effect on free speech." Reno v. American Civil Liberties Union, 521 U.S. 844, 845 (1997). Persons with a family member employed by the government would have to fear for their family member's well being whenever they "engag[ed] in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts, 468 U.S. at 618. Likewise, a government employee would be placed in the uncomfortable position of having to police, or attempt to police, her family's speech. For these reasons, it is clear that the First Amendment, as it necessarily must, protects government employees against retaliation for the speech of those with whom the employees share intimate relationships.

Title VII provides a useful analogy. In Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006), the Supreme Court described Title VII's prohibition

against retaliation as "seek[ing] to secure [the] primary objective" of Title VII, which is a workplace free from racial, ethnic, religious, and sex discrimination, "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." Thus, the Court held, the anti-retaliation provision must be read broadly.  In Thompson, 131 S. Ct. at 867, citing that reasoning, the Court "[had] little difficulty concluding that" an employer's retaliation against an employee for that employee's fiancée's filing of an EEOC charge "violated Title VII."  Similarly, because the primary objective of the First Amendment is to ensure that "debate on public issues [is] uninhibited, robust, and wide-open," Snyder, 131 S. Ct. at 1215, the amendment must necessarily be understood to protect claims like Lewis's, where the speech at issue is that of her father's.  That, however, does not mean that the reach of the amendment is endless. For a plaintiff to bring such a claim under § 1983, that

statute must provide a cause of action to the particular plaintiff, meaning that the plaintiff must fall within the constitutional provision and the enforcing statute's zone of interests. <u>Cf</u>. <u>Thompson</u>, 131 S. Ct. at 868 (stating that, while "prohibiting reprisals against third parties will lead to difficult line-drawing problems concerning the types of relationships entitled to protection," "We expect that firing a close family member will almost always meet the ... standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so," and "the significance of any given act of retaliation will often depend upon the particular circumstances") (quotation marks and citation omitted). Here, Lewis and her father's close relationship, both at law and in fact, fall within that zone of interest, and protection, under the circumstances presented.

For Lewis to support a First Amendment retaliation claim, she must show (1) that the speech at issue (in this case, her father's presentations to the board) can be

fairly characterized as relating to a matter of public
concern, (2) that her interests as a citizen outweigh the
interests of the governmental entity (here, the school
board) as an employer, and (3) that the protected conduct
(her father's speech or her association with him) played
a substantial or motivating role in the government's
decision to take an adverse-employment action. <u>Akins</u>, 420
F.3d at 1303.  Even if Lewis establishes those elements,
the defendants may escape liability if they prove that,
regardless of Lewis's father's protected speech, they
would have refused to hire her even in the absence of the
speech.  <u>Id</u>.

Here, as for the first element, that Lewis's father's
speech related to a matter of public concern, the evidence
is sufficient to find that it did.  "For speech to be
protected as speech on a matter of public concern, 'it
must relate to a matter of political, social, or other
concern to the community.'" <u>Id</u>. at 1303 (quoting <u>Watkins
v. Bowden</u>, 105 F.3d 1344, 1353 (11th Cir. 1997)).  Lewis's

father discussed the broad issue of the school board's
employment of African-Americans, which is a political and
social issue that has been the subject of local newspaper
coverage and has caused at least one sizeable protest.
See, e.g., Love-Lane v. Martin, 355 F.3d 766, 776 (4th
Cir. 2004) ("We, too, have repeatedly recognized that a
public employee's speech about racially discriminatory
practices, particularly in public schools, involves a
matter of public concern."). The defendants contend that
the speech should not be deemed a matter of public concern
because Lewis's father discussed, among other things, the
board's treatment of his daughter, which is a mere private
matter. But, "[e]ven if [Lewis's father] discussed
private concerns regarding [his daughter's] work
environment in the meeting," which it is clear that he
did, "that does not disqualify [Lewis] from protection.
It is well understood that '... speech will rarely be
entirely private or entirely public.'" Akins, 420 F.3d
at 1303-04 (quoting Morgan v. Ford, 6 F.3d 750, 755 (11th

Cir. 1993)).   Viewing the evidence in the light most favorable to Lewis, as the court must at this stage, it is apparent that her father's speech involved not only private matters but also matters of public concern.

As to whether Lewis's interests as a citizen outweigh the government's interests as an employer, the evidence here too favors her.  "[T]he state interest ... focuses on the effective functioning of the public employer's enterprise."  Rankin v. McPherson, 483 U.S. 378, 388 (1987).   Put another way, the school board, as an employer, has an interest "'in promoting the efficiency of the public services it performs through its employees,'" and it may legitimately refuse to rehire Lewis if its interests outweigh her father's interests, as a citizen, in expressing his views, and Lewis's interests in associating with her father and his speech.  Id. (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).   In this case, there is no reason to find that the board's interest in the efficient and effective functioning of its

36

schools    justifies    excluding    Lewis    from    potential
employment.   There has been no evidence or allegation that
Lewis herself at any time engaged in disruptive speech
while employed.   There has likewise been no showing that
her father's speech has disrupted school functions.   Cf.
Rankin, 483 U.S. at 388-89 ("While McPherson's statement
was made at the workplace, there is no evidence that it
interfered   with   the   efficient   functioning   of   the
office.").   The only occasion in which Lewis's father made
the protected speech at issue was at public meetings of
the board, and, because the very purpose of those meetings
is to allow the public to express its concerns, it cannot
be said that the forum was inappropriate.   Even if the
tone and form of Lewis's father's speech was offensive, as
one member of the board took it to be, there is no reason
why that would justify refusing employment to Lewis.   The
balancing test falls in Lewis's favor.

Third, that Lewis's father's speech motivated the
government's retaliation also presents a disputed issue of

37

fact.  For essentially the same reasons that a reasonable fact-finder could infer that Lewis was not rehired because of her filing of an EEOC charge, the fact-finder could also infer that the defendants were motivated by her father's speech.  That is, at the time the defendants refused to rehire her, Lewis had applied for over 25 openings; her father had made two speeches to the board, upsetting at least one board member; and, after all of that, Superintendent Sadler, in a cryptic comment, told Lewis's husband that not one of the school system's principals would hire Lewis.[5]  This factual showing is enough to survive summary judgment.

Moreover, as stated above, even if the above elements are proved, the defendants may still escape liability if they establish that they would have refused to rehire

---

5.  The evidence is somewhat unclear on the precise time line, and it appears that at least some of Lewis's job applications were filed before either of her father's speeches to the board.  Nevertheless, it also appears that many of her applications, if not the majority, were filed after one or both speeches.

Lewis regardless of her father's speech (for example, because they were legitimately dissuaded from doing so because of her demonstrated poor job performance). Whether that is the case is a factual dispute that must be resolved at trial and is inappropriate for resolution on summary judgment.

For that reason, to the extent that the defendants' motion for summary judgment goes to Lewis's First Amendment claim of retaliation, the motion will be denied.


### iii.

The court now turns to the defendants' four defenses that, if they had merit, would require the court to grant summary judgment in the defendants' favor on the retaliation claims regardless of the sufficiency of Lewis's evidence.

The defendants note that, "in order to obtain judicial consideration of [a Title VII] claim, a plaintiff must first file an administrative charge with the EEOC,"

_Pijnenburg v. W. Ga. Health Sys., Inc._, 255 F.3d 1304, 1305 (11th Cir. 2001); 42 U.S.C. § 2000e-5(e)(1), and therefore, although Lewis undoubtedly filed an initial EEOC charge claiming racial discrimination, she never filed a subsequent EEOC charge claiming retaliation for the earlier charge, and, as such, she cannot now bring the retaliation claim this lawsuit.  But, contrary to the defendants' contention, it is settled law that "it is unnecessary for a plaintiff to [file a subsequent EEOC charge before raising in federal court] a retaliation claim growing out of an earlier charge." _Baker v. Buckeye Cellulose Corp._, 856 F.2d 167, 169 (11th Cir. 1988) (quotation marks and citation omitted); _see also_ _Nealon v. Stone_, 958 F.2d 584, 590 (4th Cir. 1992) (holding as such and noting that "[a]ll other circuits that have considered the issue have determined that a plaintiff may raise the retaliation claim for the first time in federal court."); _Houston v. Army Fleet Services, L.L.C._, 509 F. Supp. 2d 1033, 1043 (M.D. Ala. 2007) (Fuller, J.) ("[W]hen a

retaliation claim is based on adverse actions taken against the employee <u>after</u> the initial EEOC charge is filed, it can be said that the retaliation claim grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation.") (emphasis in original).  The defendants' argument, that Lewis's Title VII retaliation claim in this court must fail because she failed to file a retaliation charge with the EEOC, is without merit.

The second asserted defense is the doctrine of qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Qualified immunity, which was once called "good-faith immunity," <u>see, e.g.</u>, <u>Gomez v. Toledo</u>, 446 U.S. 635,

41

639-40 (1980) ("[A] public official['s] position might entitle him to immunity if he acted in good faith."); Harlow, 457 U.S. at 807 (referring to "qualified or good-faith immunity"), essentially seeks to protect government officials from monetary liability for unexpected changes in the law.  As such, if the defendants are alleged to have violated legal rights that were not "clearly established" in the law at the time of their challenged conduct, this court will not make them pay for the lack of foresight.

In addressing whether a legal right was clearly established in the law, the question before the court is whether "the state of the law ... gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional."  Hope v. Pelzer, 536 U.S. 730, 740 (2002).  Put another way, "'[c]learly established' for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is

**42**

doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Wilson v. Layne</u>, 526 U.S. 603, 614-15 (1999) (punctuation marks and citations omitted); <u>see also</u> <u>Hope</u>, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

As an initial matter, the qualified-immunity doctrine does not apply to Title VII actions against governmental employers like the Eufaula City Board of Education.  <u>See, e.g.</u>, <u>Busby v. City of Orlando</u>, 931 F.2d 764, 772 (11th Cir. 1991); <u>Harvey v. Blake</u>, 913 F.2d 226 (5th Cir. 1990). Therefore, "a qualified immunity analysis is unnecessary under Title VII," <u>Busby</u>, 931 F.2d at 772, and the court accordingly turns to Lewis's First Amendment retaliation claim.

43

The general principle that the government cannot take
adverse-employment action in retaliation for protected
speech has long been a feature of law as declared by the
Supreme Court and the Eleventh Circuit (which includes
Eufaula in its three-state area).  <u>See, e.g.</u>, <u>Rankin</u>, 483
U.S. at 383 ("It is clearly established that a State may
not discharge an employee on a basis that infringes that
employee's constitutionally protected interest in freedom
of speech."); <u>Akins</u>, 420 F.3d at 1303 (the elements of a
First Amendment retaliation claim are "well established in
this circuit"); <u>Bryson</u>, 888 F.2d at 1565 (same).  This
principle has long been applied where failure to rehire is
the form of retaliation being challenged.  <u>See, e.g.</u>,
<u>Perry v. Sindermann</u>, 408 U.S. 593, 596 (1972) ("The first
question presented is whether the respondent's lack of a
contractual or tenure right to re-employment, taken alone,
defeats his claim that the nonrenewal of his contract
violated the First and Fourteenth Amendments.  We hold
that it does not."); <u>Mt. Healthy City Sch. Dist. Bd. of</u>

44

Educ. v. Doyle, 429 U.S. 274, 283-84 (1977) ("[Plaintiff] may ... establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.").

Additionally, the First Amendment right of intimate association has long been recognized in numerous decisions.  See, e.g., Roberts, 468 U.S. 609, 617-18.

Because the allegations (which the court must take as true on a motion for summary judgment) undergirding Lewis's retaliation claim for violation of her rights to association and speech go to the core protections of the First Amendment, the violations, if true, are obvious. Cf. Hope, 536 U.S. at 738 ("As the facts are alleged by Hope, the Eighth Amendment violation is obvious."). Indeed, apparently deciding that the issue did not merit discussion, some courts have upheld First Amendment claims of retaliation for the speech of family members and entirely passed over that the speech was made by the plaintiff's family rather than the plaintiff herself.  See

45

<u>Ward v. Athens City Bd. of Educ.</u>, 1999 WL 623730 (6th Cir. 1999) (unpublished) (upholding children's First Amendment retaliation claim alleging that the children were punished for their mother's speech; holding that "the impermissibility of retaliation is sufficiently well established that the defendants are not entitled to qualified immunity"; and, not discussing the legal implications of the protected speech at issue being made by the children's mother rather than the children); <u>Henley v. Tullahoma City Sch. Sys.</u>, 84 F. App'x 534, 539-40 (6th Cir. 2003) (unpublished).

In sum, government officials reasonably apprised of the law and acting in good faith would, if acting as Lewis has alleged, have had more than "fair warning that their [conduct] was unconstitutional." <u>Hope</u>, 536 U.S. at 740. It cannot be questioned that a reasonable government official would know that he would violate the First Amendment's core protections if he retaliated against an employee for her own free speech. Knowing as much, it is

46

clear that no reasonable official could think that he
would be free to retaliate against an employee for her
relationship or association with her father and his
exercise of free speech.  <u>Cf</u>. <u>id</u>. at 742-43 ("No
reasonable officer could have concluded that the
constitutional holding of [<u>Gates v. Collier</u>, 501 F.2d 1291
(5th Cir. 1974)] turned on the fact that inmates were
handcuffed to fences or the bars of cells, rather than a
specially designed metal bar designated for shackling.")
(citation omitted).  For that reason, the defendants can
find no refuge in the doctrine of qualified immunity.

The third asserted defense is the so-called <u>Monell</u>
doctrine.  In <u>Monell v. Dep't of Soc. Serv.</u>, 436 U.S. 658,
694 (1978), the Supreme Court held that a municipal agency
(such as the Eufaula City Board of Education) could be
held liable under § 1983 only where the plaintiff's rights
were violated by a "policy or custom" of the defendant
agency (rather than conduct of an agency employee acting
alone).  A typical case in which the <u>Monell</u> defense

**47**

applies would be, for example, one in which a city seeks
to avoid being held responsible for an unlawful act of one
of its police officers, arguing that the city itself
committed no wrong and should not be made to pay for the
acts of a rogue officer.  See, e.g., City of Oklahoma City
v. Tuttle, 471 U.S. 808 (1985).  But this is no such case.
Here, Lewis alleges that the board itself, as controlled
through the board member defendants, unlawfully retaliated
against her, and thus, nothing in Monell exempts the board
from liability here.  See Jamieson v. Poughkeepsie City
Sch. Dist., 195 F. Supp. 2d 457, 474 (S.D.N.Y. 2002)
(McMahon, J.) ("Plaintiff need not establish an official
policy or custom of the District if the trier of fact
finds there has been a decision by a municipal policymaker
who possesses final authority to establish municipal
policy with respect to the action ordered."); Hamilton v.
Montgomery Cnty. Bd. of Educ., 122 F. Supp. 2d 1273, 1289
(M.D. Ala. 2000) (DeMent, J.) ("Plaintiff can demonstrate
an official policy or custom by showing that his adverse

48

employment decision resulted from ... [a] decision officially adopted and promulgated by board members").

Finally, the school-board members and the superintendent are correct that Lewis's Title VII retaliation claim does not lie against them in their "individual capacities." Busby, 931 F.2d at 772 ("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.") (emphasis in original). They are also correct that, because Lewis has named the school board as a defendant on her Title VII retaliation claim, naming them too as defendants in their "official capacities" is redundant. See Busby, 931 F.2d at 776 (affirming district court's dismissal of § 1983 claims against official capacity defendants, stating, "To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury."); id. at 772 ("We think the proper method for a plaintiff to

recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly."). Lewis's Title VII retaliation claim is viable against only the school board in this case.

At the end of the day, after having assessed all asserted defenses, there remains standing in this case only Lewis's Title VII retaliation claim against the board and her First Amendment retaliation claim against all defendants.

\*\*\*

Accordingly, it is ORDERED that defendants Eufaula City Board of Education, Allen N. White, Jim S. Calton, Jr., Louise Conner, Otis Hill, James A. Lockwood, and Barry R. Sadler's motion for summary judgment (Doc. No. 20) is granted in part and denied in part as follows:

(1) Summary judgment on plaintiff Crystal C. Lewis's First Amendment retaliation claim brought under 42 U.S.C.

§ 1983 against all defendants is denied.  This claim will
go trial.

    (2) Summary judgment on plaintiff Lewis's Title VII
retaliation claim against defendant Eufaula City Board of
Education is denied.  This claim will go trial.

    (3) Summary judgment on plaintiff Lewis's Title VII
retaliation claim against defendants White, Calton,
Conner, Hill, Lockwood, and Sadler is granted, with
plaintiff Lewis taking nothing on this claim against these
defendants.

    (4) Summary judgment on plaintiff Lewis's Title VII
discrimination claims against defendants Eufaula City
Board of Education, White, Calton, Conner, Hill, Lockwood,
and Sadler is granted, with plaintiff Lewis taking nothing
on these claims against these defendants.

    DONE, this the 4th day of December, 2012.


                    /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE